Our third case for this morning is 20-1799, Belcher Pharmaceuticals, LLC v. Hospira, Inc. Mr. Lancaster, you reserve three minutes of rebuttal time. We're ready to proceed when you are. May it please the Court, Counsel, we make a very limited argument. We ask this Court to reverse the judgment of inequitable conduct, because the record lacks evidence that Belcher intentionally misled the PTO in any respect. And indeed, we make a stronger argument than that. The District Court recognized that nothing, no art, whether the inequitable conduct references or other art, anticipated the two claims at issue. And we would submit that none of the three inequitable conduct references would have invalidated the claims under Section 103 either. No prior art amongst those three references had the combination of pH range, low overage, and stability that the Belcher invention did. I'd like to say something about the background. Could I just ask you one question about what you just said? Do I remember correctly that the claims don't require any-they don't say anything about overage? They speak in terms of concentration. And obviously, overage and concentration are the same thing when volume is constant. And that becomes pertinent, I think, when you're looking at the state of mind of the Belcher participants, particularly Mr. Rubin. There's evidence in the record that he treated those two terms as being synonymous or close to synonymous. And although the claims don't speak in terms of overage, that's what he intended. We think that the district court appropriately relied on that distinction in finding no infringement. But we think the inequitable conduct analysis is different. And can I-this is just-can I just ask you a mundane question just to be clear? This case arises under the post-AIA version of the statute, is that right?  That's correct, Your Honor. Okay. And the JHP adrenaline product, it's an anticipatory thing, not-it's not a publication. It is rather a product that was either in public use or on sale or otherwise available to the public. Is that right? That's correct. But I think as the court appreciates, the district court found that it was not anticipatory. It found that it was material. Right. I'm trying to get my hands on what it is that this product is, whether it's a document or whether it's an actual physical product that was, let's say, on sale, whose elements can be proved a number of different ways, including through documents. That's correct, Your Honor. Okay. And so I'd like to return to an unanswered question, one not mentioned by the district court, who obviously generally wrote a very careful opinion. And that is, if this invention were so obvious and if it were so apparent to Mr. Rubin that it was obvious that he was guilty of inequitable conduct, why did it take decades of effort for the industry giants, including Hespera, to produce the product that Belcher succeeded in producing? And before I say a word about each of the three references that the district court relied on for inequitable conduct, I want to say a little bit more about what makes this record one that finding of intentional wrongdoing is implausible. Of course, Belcher wanted to get approval from the FDA as promptly as possible. Of course, it wanted to get a patent as soon as possible. And that supplies the motivation that Hespera emphasizes. But there's a number of facts that argue against any plausible motive to misrepresent. A central irony of this case is that the key elements of the two claims at issue, the pH levels, were written not by Belcher, but through an amendment by the examiner. And that process would assume, under Hespera's theory, a Machiavellian level of sophistication that few applicants would have and certainly an inexperienced applicant like Belcher would not have. Mr. Lancaster, this is Judge Reyna. It would certainly help me if you were to base your arguments on the standard that we're looking at for this case. The district court made a number of findings regarding information that was either withheld, omitted, or misrepresented to the PTO. And one of the elements there is whether those factors, those representations or omissions, are material. Can you address that particular issue? Yes. So, of course, the inequitable conduct test is a two-part analysis. The first part being a question of whether the withheld references are material. And the second part being whether they're not being provided to the PTO are a matter of bad faith, of dishonesty. And there are different standards depending upon which components you're looking at. When you're looking at credibility based upon demeanor, then there is an abuse of discretion standard. But when you're looking at an issue where there's documentary or objective evidence that's available, then a clear error standard applies. And one of the cases that we cite establishes that being an unpersuasive or defensive witness, as Mr. Rubin would probably be the first to admit that he was, that doesn't necessarily establish inequitable conduct. The district court was obviously very frustrated by the testimony of Belcher witnesses. But that alone, as is indicated in the American CalCAR case that we cite, is not sufficient to establish inequitable conduct. Did I answer your question, Your Honor? No, not really. You kind of recited back our law under Thurisance. But so let me ask you this way. Didn't Belcher, for example, have an obligation to clarify the arguments in the specification and make to the examiner that the pH range was novel and unexpected? The situation from its application is the same as the situation for the final amendment. The application did not recite pH levels for the only pair of claims that included the pH range that's at issue here, the 2.8 to 3.3 range. The arguments were made in the context... Let me ask you this way. Is a pH range that's disclosed in the broad claims of 6 and 7, were they not unexpected? The effect of that pH range was unexpected to Belcher, yes. And the misrepresentation is that these were novel and unexpected? That's what the claim's misrepresentation is, yes. Can you explain to me why that's not a material misrepresentation? Because the statements have to be looked at in the context in which they were made. And in a preservative-free, sulfite-free composition, I don't think there's an argument that there's any misrepresentation. And that was the context in which Belcher was making those arguments. In its response to the office action, it sent in a 13-page response, and virtually all of it related to the preservative-free, sulfite-free invention. And it's ironic, as I say, that the claim that eventually emerged and was litigated, the pair of claims, did not have those two limitations, which is how the patent started off being prosecuted. So the patents did not have... Claims 6 and 7 did not have the limitations of preservative-free and low to no overage, correct? They did have the low to no overage, but they were not sulfite and preservative-free. When I say they have low to no overage, there was earlier a question about the comparison of concentration to overage. And as I said, there is evidence in the record that Mr. Rubin treated those two terms as equivalent. So that's what I meant when I answered your question, Your Honor. What the claim says is 1.0 to 1.06 milligrams per milliliter. And with the volume that's assumed there, that is the same as up to a 6% overage. Just to say a couple other things about what we think is the implausibility of a finding of intent. This is not a case where someone might want to obtain a patent to bully a smaller or less sophisticated competitor. This is a patent that Belcher knew Pfizer would likely challenge. The large producer JHP was also in this field. Belcher knew when it got this patent that it would be challenged. And that's a reason that it would not intentionally push through a patent that it knew to be invalid or obvious. So if I could say a word about the three references. Why don't I go ahead and stop there, Your Honor. And I'll deal with specific references to the extent that Husker Council raises them. Let's hear now from Counselor Freemus. Good morning, Your Honor, and may it please the court. Belcher has offered no basis for this court to conclude that Judge Stark committed clear error or abused his discretion in finding that Darren Rubin committed inequitable conduct. Mr. Rubin created a fiction throughout the patent specification and the prosecution history that the claims pH of 2.8 to 3.3 is an inventive feature. Faced with the examiner's rejection of all the claims in the examiner's first office action, Mr. Rubin distinguished the prior art by leading the examiner to believe that the pH range was, quote, unexpectedly found to be critical by the applicant to reduce the racemization of L-epinephrine. That appears at Apex 1073. That statement, among others in the patent specification that Mr. Rubin drafted, was false, and Mr. Rubin knew it. At the time he made that statement to the PTO and others, he knew of no less than three references that showed there was nothing inventive about the pH range of 2.8 to 3.3. I'm sorry. Just to clarify, the basis of that knowledge were documents or products that were preservative-free or were not preservative-free? I'm including sulfide in the preservative.  The Penske and the JHP Adrenaline product refer to epinephrine formulations that contain preservatives and sulfides. One of the additional products is a preservative-free, sulfide-free formulation that was manufactured by Belcher's own contract manufacturer, Synthetica, more than 10 years prior to the submission of the patent application. That old preservative-free, sulfide-free formulation of Synthetica's had a pH of 2.8 to 3.3. I'm afraid I'm not so clear about this. The Synthetica stuff was not among the prior art that the district court's obviousness ruling relied on. Is that right? You have that right, Your Honor. The Synthetica product was not among the prior art that formed the basis of the district court's obviousness opinion. I'm sorry. It's the Synthetica product that is the only one of the three that Mr. Rubin knew about that was sulfide-free and preservative-free? Is that right? Of the three, it is the only one that is preservative-free, sulfide-free. That's correct. But I would point out that Mr. Rubin knew and understood that the claims of the patent included formulations that would include preservatives and sulfide. There's an email that Judge Stark cites in his opinion where Mr. Rubin notes that Claims 6 and 7 don't require preservative-free, sulfide-free formulations. With those claims, Claims 6 and 7, do you know if they were originally presented in the application? Claims 6 and 7 were originally presented in the application. That is correct. Okay. Thank you. I'm sorry. The relevance of this is not so clear, but I guess I'm looking at Appendix Page 1025-1026, which I think are the original claims. 6 and 7 depend on 5. 5 says preservative-free and sulfide-free. Correct. So, it's 8 and 9 that don't have that limitation, right? 8 and 9 eventually became 6 and 7, Your Honor. Correct. And they do not have the preservative-free, sulfide-free limitation. Rather than disclose information about the Stepensky JHP Adrenaline product, Stepensky referenced the JHP Adrenaline product and the Synthetica product, Mr. Rubin perpetuated the fiction that the pH was inventive by choosing unilaterally not to disclose anything that contradicted those statements. He told the examiner that the pH was inventive, and then he withheld material that showed it wasn't. And based upon the fiction he created, the examiner allowed the claims. The examiner's reasons for allowance, which appear at Apex 1088, identify a single reason for allowing the claims. She was led to believe, quote, there was nothing in the prior art that would teach or suggest the instantly claimed pH range of between 2.8 to 3.3 would result in limited rastimization and impurities as instantly claimed. In fact, each of the three references that Mr. Rubin withheld disclosed that. As a result of his misleading statements during the prosecution and his failure to disclose relevant information, the examiner was misled into believing that there was nothing in the prior art that would teach or suggest the claims pH range of 2.8 to 3.3 would result in limited rastimization. The examiner allowed the claims because she was led to believe the fiction. That's the record in this case, and it fully supports Judge Stark's conclusion that Mr. Rubin engaged in inequitable conduct in connection with the prosecution of the 197 patent. There's no basis to conclude that he committed clear error, and there's no abuse of discretion. I want to talk first about the issue of intent to deceive, which counsel raised in his argument. There's statements in the briefs, and then we heard again this morning that Mr. Rubin or a suggestion that Mr. Rubin may have been a novice. That notion is wrong and contradicted by the record. Rubin was Belcher's chief science officer. He was described as the company's head of IP. His job responsibilities included patent writing and patent prosecution. He participated in the drafting of the specification. He served as the liaison between Patent Council and the CEO of Belcher. He drafted the response to the initial office action, bragging that he, quote, dug into the case law in connection with preparing it. With respect to Belcher's development of epinephrine, Mr. Rubin testified, quote, he project managed everything. It all led to me. That appears at Apex 679-680. That's the record in the case, and it fully supports the notion that Mr. Rubin knew what he was doing in connection with the prosecution of this patent. Mr. Rubin also knew that the pH of 2.8 to 3.3 was not inventive or critical. At the time he wrote the patent specification, at the time he wrote in the specification that, quote, the thought of raising the in-process pH above 2.2 to 2.6 was contradictory to one skilled in the art. He knew that his own contract manufacturer, Synthetica, had created a preservative-free, sulfite-free formulation with the claimed pH as far back as 2002, and that Belcher considered that pH as old. He knew that Belcher had cited Stepensky in two separate submissions to the FDA, and he emailed that to his regulatory consultant, specifically pointing out Stepensky's findings on racemization had, quote, stood out to him. He knew about test data about the JHP product, showing that it had the pH within the claimed range and low levels of impurities. In spite of all that knowledge, he included misleading statements in the prosecution history that described the pH as an inventive feature, and then unilaterally decided to withhold information that contradicted it. Counselor, is it your argument that Mr. Rubin-that it appears that Claims 6 and 7 were drawn to the preexisting Synthetica formulation? We do not take the position that the Claims 6 and 7 were drawn to the prior Synthetica formulation, but the prior Synthetica formulation was a formulation-was a preservative-free, sulfite-free formulation within the pH range claimed in Claims 6 and 7. Okay. On the basis-sorry, Your Honor, if I cut you off. No, you did. Go ahead, please. On the basis of the information known to Mr. Rubin, and in light of his misrepresentations to the contrary, the court appropriately concluded that deceptive intent was the only reasonable inference that could be drawn. The pH range of 2.8 to 3.3 was not some inventive epiphany. Belcher's outside regulatory consultant suggested pursuing that pH range because it was a fast path to regulatory approval, and Mr. Rubin knew that. The court-the same excuses that Mr. Rubin and Belcher proffer in their brief for why the prior art was not disclosed or why the references were not disclosed were heard, considered-heard and considered by Judge Stark, who made a determination that those excuses were neither credible nor plausible. Judge Stark heard Mr. Rubin evade answers and injected the very same attacks on the prior art, including testimony in which Mr. Rubin tried to distinguish the withheld references on the basis that they described high overage product. In fact, Judge Stark conducted his own examination of Mr. Rubin on some of these precise issues, which appears at Apex 723 and 732. After hearing Mr. Rubin's testimony, including under direct examination from the court, Judge Stark concluded that Mr. Rubin's excuses were neither credible nor plausible, and there was no clear error in his doing so. In fact, Judge Stark's determination that Mr. Rubin's excuses weren't credible or plausible is entirely consistent with the record before the court. The fact that the withheld references were high overage didn't excuse Mr. Rubin's failure to disclose them. There's not a single mention of the overage in the notice of allowance, and Mr. Rubin never distinguished prior art before the examiner on the basis that Belcher was pursuing a low overage product. The fact that Synthetica-go ahead, Your Honor. Go ahead, Counselor. I'll go ahead. The fact that Synthetica and the JHP product included preservatives or sulfites similarly did not excuse Mr. Rubin's failure to disclose them. The patent included formulations containing preservatives, and Mr. Rubin understood as much. As I noted earlier, he mentioned in an email to the CEO describing Claims 6 and 7 as not mentioning preservatives or sulfites. That appears at Apex 2069 and was relied upon by Judge Stark, and there's a statement in Column 5 of the patent beginning at Line 27, which appears at Apex 1001, that shows the so-called inventive methods achieve new limits, quote, even if preservatives and sulfites are optionally included. In summary, Your Honor, this is a case where Mr. Rubin made multiple statements that the pH was inventive. The examiner allowed the claims on that basis. Mr. Rubin possessed multiple pieces of information that contradicted the examiner's express basis for allowance, and Mr. Rubin failed to disclose any of it. On the basis of that record, there's no reason to conclude that Judge Stark committed clear error or abused his discretion. This is a situation where Mr. Rubin made misleading, incomplete, if not plainly inaccurate statements combined with the active omission of relevant information and fully justifies the court's finding of inequitable conduct. Thank you, Your Honor. We thank you, Mr. Freymuth. Mr. Lancaster, you have three minutes. Thank you, Your Honor. I hope to say just a word about each of the three inequitable conduct references, starting with Synthetica. The most important point about this product is that it was not shown to be prior art, which the court recognized in its obviousness analysis, but still stated that it should be disclosed. And we submit that that's a confusion of the Rule 56 standard, which would indicate that even non-prior art should be disclosed, and the Theracent standard, where the question is whether it would have prevented issuance of the patent. It couldn't have prevented issuance of the patent. Counsel indicated that that product was a preservative-free product. Yes, it was, but it had a pH level of 2.5, excuse me, 2.4, and high overages up to 14%. It was a very different product. Stepensky, that product had overages as high as 10%. It failed nearly every limitation of Claims 67. There was no pH between 2.8 and 3.3 within a commercially reasonable period, and almost all the testing that Stepensky describes is well above 3.3. That's the subject of the chart, the diagram, that's at the opening voucher brief at APT 34. And finally, the JHP product. Here, the most important distinction is testing that Hospira did and what Mr. Rubin actually knew. And the District Court did not distinguish between those two things. And obviously, Mr. Rubin cannot be held responsible for Hospira testing that he didn't have access to. That product was also different because it wasn't sulfide and preservative-free, the context that every independent claim up until the final amendment by the examiner, and it was also a high overage product, 9% to 13%. So of those three pieces of allegedly withheld, well, not disclosed prior art, one was not prior art at all, Synthetica. One was not known in relevant respect to Mr. Rubin, JHP. And the third, Stepensky, fails to meet every key limitation of the claims. Can I just ask you one thing? You said that every independent claim up until the end required preservative-free and sulfide-free. I thought original claims 8 and 9 did not, and 8 is an independent claim. Yes. I'm sorry. But those two claims, what I'm focused on is, as Hospira focuses on, is the 2.8 to 3.3 range. And so those two claims don't have that range. Okay. I was speaking a little bit sloppily. Okay, thanks. Okay, I think your time is up, sir. Do you want to conclude real quick? We submit that for the reasons that we've stated, there isn't a basis for inequitable conduct here, and we ask this court to reverse that finding. Thank you all, your honors. Thank you very much. And we thank all parties for the arguments this morning. This last case is now submitted, and this concludes arguments for this morning. The honorable court is adjourned from day to day.